ACCEPTED
04-15-00427-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
8/17/2015 6:58:46 PM
KEITH HOTTLE
CLERK

## No. 04-15-00427-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
08/17/2015 6:58:46 PM
KEITH E. HOTTLE
Clerk

IN THE
COURT OF APPEALS FOR THE
FOURTH COURT OF APPEALS DISTRICT
SAN ANTONIO, TEXAS

_____

CRAWFORD MEDICAL SUPPLIES, LLC, SAM MADDALI, PREM SWAROOP
KALIDINDI, AND MADDALI REALTY, LLC
APPELLANTS

VERSUS

HUNTLEIGH HOME MEDICAL, LTD. AND JANE ELIZABETH FLORES
APPELLEES

_____

APPEAL FROM THE 57TH JUDICIAL DISTRICT COURT, BEXAR COUNTY, TEXAS
NO. 2013-CI-00404

## APPENDIX TO BRIEF OF APPELLANTS

PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP
Elliott S. Cappuccio
Texas State Bar No. 24008419
Leslie Sara Hyman
Texas State Bar No. 00798274
Etan Z. Tepperman
Texas State Bar No. 24088515
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 (Telephone)
(210) 892-1610 (Facsimile)

*Attorneys for Appellants*

APPELLANTS REQUEST ORAL ARGUMENT

TABLE OF CONTENTS

**Document**                                                                                                   **Tab**

June 16, 2015 Order Granting in Part and Denying in Part
Defendants' Plea in Abatement and Motion to Compel Arbitration ..........................1

Operating Agreement ..................................................................................................2

Plaintiffs' Third Amended Petition ............................................................................3

# Tab 1



2013CI00404 -D057

CAUSE NO. 2013-CI-00404

| | | |
|---|---|---|
| HUNTLEIGH HOME MEDICAL, LTD., JANE ELIZABETH FLORES, AND MICHAEL FLORES, | § § § § | IN THE DISTRICT COURT |
| PLAINTIFFS | § § | |
| V. | § § | 57TH JUDICIAL DISTRICT |
| CRAWFORD MEDICAL SUPPLIES, LLC, SAM MADDALI, PREM SWAROOP KALIDINDI, AND MADDALI REALTY, LLC, | § § § § § | |
| DEFENDANTS | § | BEXAR COUNTY, TEXAS |

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PLEA IN ABATEMENT AND MOTION TO COMPEL ARBITRATION

---

On this date the Court considered Defendants' Plea in Abatement and Motion to Compel Arbitration. After careful consideration of the motion and Plaintiffs' response, and having taken judicial notice of Plaintiffs' Second and Third Amended Petitions, the Court is of the opinion that the motion should be granted in part and denied in part.

Accordingly, it is hereby **ORDERED** that Defendants' Plea in Abatement and Motion to Compel Arbitration is **GRANTED IN PART** such that, consistent with the Court's Order dated August 30, 2013, any claims by and against Michael Flores that arise out of or relate to his employment agreement with Crawford Huntleigh Medical Supplies, LLC n/k/a Crawford Medical Supplies, LLC shall be decided in arbitration and this lawsuit is abated and stayed pending arbitration only as to such claims.

It is further **ORDERED** that Defendants' Plea in Abatement and Motion to Compel Arbitration is in all other respects **DENIED**.

SIGNED AND ENTERED this ___16___ day of June, 2015.

_____
Judge Presiding

**APPROVED AS TO FORM:**

_____
Elliott S. Cappuccio
Texas State Bar No. 24008419
ecappuccio@pulmanlaw.com
Leslie Sara Hyman
Texas State Bar No. 00798274
lhyman@pulmanlaw.com
**PULMAN, CAPPUCCIO,
PULLEN, BENSON & JONES, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**ATTORNEYS FOR DEFENDANTS**

_____
Mark Murphy
State Bar No. 24002667
**DAVIS & SANTOS**
Attorneys & Counselors, P.C.
112 E. Pecan Street, Suite 900
San Antonio, Texas 78205
Telephone: (210) 853-5882
Facsimile: (210) 200-8395

**ATTORNEYS FOR PLAINTIFFS**

2

571

# Tab 2

# OPERATING AGREEMENT

## OF

## CRAWFORD HUNTLEIGH MEDICAL SUPPLIES, LLC

## A TEXAS LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT ("Agreement") is made as of this 12ᵗʰ day of December, 2011 by and among **PREM SWAROOP KALIDINDI** ("Kalidindi"), an individual having an address at 171 Forest Drive, Piscataway, New Jersey 08854, **ANNAPURNA MADDALI** ("Maddali"), an individual having an address at 1 Cather Court, Ledgewood, New Jersey 07852, and **OBDULIA, LLC**, a Texas limited liability company, having an address at 302 Rua da Matta, San Antonio, Texas 78232 and **CRAWFORD HUNTLEIGH MEDICAL SUPPLIES, LLC**, a Texas limited liability company having an address at 5626 Randolph Boulevard, Ste. 2, San Antonio, Texas 78233 (the "Company"). Kalidindi, Maddali, and Obdulia, LLC shall collectively be referred to as the "Members".

## WITNESSETH:

WHEREAS, the Members desire to enter into this Operating Agreement ("Operating Agreement" or "Agreement") for the purposes of governing CRAWFORD HUNTLEIGH MEDICAL SUPPLIES, LLC, a Texas limited liability company ("Company") herein formed, to and for the purpose of owning and operating a medical supply and durable medical equipment business (the "Business"). The Company shall not conduct any other business unless related to the Business, unless approved as provided below.

NOW THEREFORE, in consideration of the mutual premises below, and other good and valuable consideration receipt and sufficiency of which is hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I.     DEFINITIONS

Section 1.01   **Definitions.** The following terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

> (a) "Act" means the Title 3 of the Texas Business Organizations Act, which pertains to the formation and operation of limited liability companies, including amendments thereto from time to time.

> (b) "Agreement" means this operating agreement, as originally executed and as amended from time to time.

1

505

(c) "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

(d) "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

(e) "Business" means the sale of home medical supplies and durable medical equipment.

(f) "Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Section 3.02.

(g) "Capital Contribution" means, with respect to any Member, the amount of the money, the forgiveness of any debt, and the Fair Market Value of any services or property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution shall not be deemed a loan.

(h) "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the voluntary or involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

(i) "Certificate of Formation" means the document required to be filed with the applicable office of the state of Texas to establish a limited liability company in Texas.

(j) "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

(k) "Company" and/or "LLC" means the company named in Section 2.02.

(l) "Contributing Member" is defined in Section 3.03(a).

(m) "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and

2

506

to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

(n) "Employment Agreement" means the employment agreement dated December ____, 2011 between the Company, as employer, and Michael David Flores, as employee.

(o) "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

(p) "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

(q) "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(i) The Fair Market Value of any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(ii) The Fair Market Value of any item of Company property distributed to any Member shall be the value of such item of property on the date of distribution, as mutually agreed by the distributee Member and the Company; and

(iii) Fair Market Value for purposes of Section 8.06 shall be determined under Section 8.08.

(r) "Initial Member" or "Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

(s) "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

(t) "Losses". See "Profits and Losses".

3

507

(u) "Majority of Members" means a Member or Members whose Percentage Interest represent more than 50 percent of the Percentage Interests of all the Members.

(v) "Managing Member(s)" means such Member or Members who constitute a Majority of Members.

(w) "Meeting" is defined in Section 5.03.

(x) "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

(y) "Non-Contributing Member" is defined in Section 3.02.

(z) "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, by certified mail or for overnight delivery, postage and fees prepaid, in the United States mail; when delivered to Federal Express, United States Postal Service Express Mail or United Parcel Service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

(aa)"Percentage Interest" of each Member in the Company is the same percentage as each such Member's allocation of Profits and Losses is to all Profits and Losses, as set forth in Section 4.01.

(bb)    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

(cc)"Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC section 703 (a).

(dd)    "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such

4

508

Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

(ee) "Substituted Member" is defined in Section 8.09.

(ff) "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

(gg) "Supermajority" shall mean Members owning an aggregate of 76% or more of the Percentage Interests of the Company.

(hh) "Transfer" means, with respect to a Percentage Interest, or any element of a Percentage Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

(ii) "Triggering Event" is defined in Section 8.05.

(jj) "Vote" means a written consent or approval, a ballot cast at a Meeting, or a voice vote.

(kk) "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II.    FORMATION

Section 2.01    **Formation.** The Members hereby associate themselves into a limited liability company pursuant to the provisions of the Act upon the terms and conditions hereinafter set forth.

Section 2.02    **Name.** The name of the Company shall be CRAWFORD HUNTLEIGH MEDICAL SUPPLIES, LLC.

Section 2.03    **Company Registered Agent; Office.**

(a) The Company shall have its registered office at 5601 Granite Parkway, Suite 400, Plano Texas 75024.

(b) The name of the registered agent of the Company is Jeffrey Yates.

Section 2.04 **Principal Office.** The principal executive office of the Company shall be 5626 Randolph Boulevard, Ste. 2, San Antonio, Texas 78233 or at such location as may be designated by the Majority of the Members. The Managing Member shall give Notice to each Member of any change in office, agent and principal place of business.

Section 2.05 **Purpose.** The purpose for which the Company is organized is for the ownership and operation of the Business. The Company shall engage in no other business or venture, except upon the unanimous written agreement of all the Members.

Section 2.06 **Existence.** The term of existence of the Company shall commence on the effective date of filing of the Certificate of Formation with the responsible state of Texas office which accepts such filings, and shall continue until the winding up and liquidation of the Company in accordance to this Agreement or as provided by law.

Section 2.07 **Company's Property.** All tangible and intangible, real and personal property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes.

## ARTICLE III.    CAPITAL CONTRIBUTIONS

Section 3.01 **Contribution.** Each Member shall contribute to the Company the Member's Capital Contribution in the amounts respectively set forth in Exhibit A.

Section 3.02 **Failure to Make Capital Contribution.** If a Member fails to make the required initial Capital Contribution as set forth in Section 3.01 above within 10 days after demand from the Company or any member that has made its required Capital Contribution, then the unfunded Member's entire Membership Interest shall terminate and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees incurred, caused by the failure to make such Capital Contribution. The remaining Members shall have the right to own the defaulting Members interest in percentage to their interest in the Company.

Section 3.03 **Capital Call.** Subject to Section 3.04, upon an affirmative vote of by a Supermajority of the Members, the Members shall contribute to the capital of the Company from time to time and in proportion to their respective percentage Membership Interests in the Company, such sums of money as shall have been determined by the Members to be necessary in order to pay the debts and obligations of the Company as the same become due and payable, to make necessary capital improvement, and to prudently operate the Company's business. Each Member shall be severally obligated to the Company for such Member's proportionate share of the contributions to be made by the Members, and a contribution by a Member shall be made upon request being made therefore by the Company as described in this Section 3.03. A Member shall be in default of such Member's obligation to make additional Capital Contribution under this Section 3.03 (a "Non-Contributing Member") if (i) the Non-Contributing Member fails or

6

refuses to fund such Member's share of the additional cash required by the Company within ten days after delivery of the written capital call notice required under this Section 3.03, and (ii) the Non-Contributing Member fails or refuses to cure such default within five days after written notice of the failure is delivered (or deemed to have been delivered) by any Member who has satisfied such Member's obligation to make additional Capital Contributions with respect to the capital called and being funded (a "Contributing Member"). If a Non-Contributing Member is in default on such Member's obligation to make additional Capital Contributions, the exclusive remedy shall be that the Contributing Members may, but shall not be obligated to, exercise, by delivery of written notice to that effect to the Non-Contributing Member, the following actions or remedies from the failure of the Non-Contributing Member to make such Member's required additional Capital Contributions:

(a) any Contributing Member may advance to the Company the Non-Contributing Member's proportionate share (in proportion to the relative Membership Interests of all Contributing Members, or such other proportion as may be agreed by such Members) of the defaulted amount on the following terms:

(i) the advance shall constitute a loan by the Contributing Member to the Non-Contributing Members, which loan is used by the Non-Contributing Member to make such Member's additional Capital Contribution to the Company.

(ii) the amount loaned shall bear interest at a rate of interest equal to the prime rate of interest as published in *The Wall Street Journal* from time to time (the "Prime Rate") plus two percent (2%) per annum (or the maximum rate permitted by applicable law, if less) from the day the advance is made until the loan, together with all interest accrued thereon, is repaid to the Contributing Member;

(iii) all distributions from the Company that otherwise would be made to the Non-Contributing Member shall instead be paid to the Contributing Member until the loan and all interest accrued shall have been repaid in full; and

(iv) upon making the advance to the Company, the Contributing Member shall have a continuing security interest, which is hereby granted by each Member to the extent such Member becomes a Non-Contributing Member, in the Non-Contributing Member's Membership Interest, now owned and hereafter acquired, and the Contributing Member shall be entitled to all the rights and remedies of a secured party under the Texas Uniform Commercial Code; or

(b) Any Contributing Member may make an additional Capital Contribution to the Company in an amount up to such Member's proportionate share (in proportion to the relative Membership Interests of all Lending Members and Contributing Members, or such other proportion as may be agreed by such Members) of the defaulted amount, in which event (i) the Membership

7

Interest of the Contributing Member shall be increased to that percentage which equals such Member's total Capital Contribution divided by the total Capital Contributions made by all Members to date, and (ii) the Membership Interest of the Non-Contributing Member shall be correspondingly decreased.

(c) In connection with any advances made by Contributing Members under Section 3.03, this Agreement shall constitute a security agreement for purposes of the Uniform Commercial Code. Each Member, to the extent he becomes a Non-Contributing Member, hereby agrees to execute and deliver to each Contributing Member such Uniform Commercial code financing statements as the Contributing Member may request from time to time covering the security interest created hereunder. The Contributing Member shall be entitled to record such financing statements (or photocopies thereof) for the purposes of perfecting the security interests created hereunder and providing public notice thereof.

Section 3.04  **Capital Call Option.**  Notwithstanding the provisions of Section 3.03, any Member shall have the right to declare a Capital Call to the Company upon the occurrence of any of the following:

(a) default of a loan, contract or agreement, where the liquidated amount to satisfy the debt is in excess of $15,000 provided there are insufficient funds in the working capital fund;

(b) the filing or imminent threat of a filing of mortgage or lien foreclosure, tax lien, litigation, judgment, summary dispossession or eviction proceeding affecting the business premises of the Company, replevin proceeding, involuntary Chapter 7 Bankruptcy petition, against the Company or any of the Company's assets; or

(c) default of any loan, contract or agreement that has been personally guaranteed by any Member or its principals.

Section 3.05  **Capital Accounts.**  An individual Capital Account shall be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Profits, (2) decreased by that Member's share of Losses, and (3) adjusted as required in accordance with applicable provisions of the Code and Regulations.

Section 3.06  **No Withdrawals of Capital Contribution.**  A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company, except as provided in this Agreement.

Section 3.07  **No Interest.**  No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

Section 3.08  **No Personal Liability.**  A Member shall not be bound by, nor be personally liable

8

for, the expenses, liabilities, or obligations of the Company, except as otherwise provided in the Act, in this Agreement, or in a separate written agreement executed by such Member.

Section 3.09   **No Priority.**  Except as set forth otherwise, no Member shall have priority over any other Member with respect to the return of a Capital Contribution, or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV.    ALLOCATIONS AND DISTRIBUTIONS

Section 4.01   **Reserves.**  Subject to maintaining the Company in a sound financial and cash position (which, without limiting the generality of the foregoing, shall include the provision for losses affecting the cash position of the Company and the payment or provision for payment, when due, of obligations of the Company) and establishing such Reserves as are determined by a Majority of the Members, in their reasonable discretion, the Company shall distribute funds to the Members as provided herein.

Section 4.02   **Allocations.**  The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to each Member in accordance with their Membership Interests. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg. sections 1.704-1 (b)(2)(ii)(d)(4), 1.704-1 (b)(2)(ii)(d)(5), or 1.704-1 (b)(2)(ii)(d)(6), as same may be amended from time to time, or under any successor statutes thereof, items of Company gross income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section 4.02 shall be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocations of income and loss and all other items shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred. The provisions of this Section 4.02 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Reg sections 1.704-1(b) and 1.704-2, as same may be amended from time to time, or under any successor regulations thereof, and shall be interpreted and applied in a manner consistent with such Regulations.

Section 4.03   **Unrealized Appreciation/Depreciation.**    Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property, and such Profits or Losses shall be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.01. Any property so distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.03, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

Section 4.04   **Transfer of Interest.**  In the case of a Transfer of an Economic Interest during

513

any fiscal year, the Assigning Member and Assignee shall each be allocated a share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

Section 4.05 **Operating Profits.** Except as set forth otherwise, cash resulting from the normal business operations of the Company and from a Capital Event shall be distributed among the Members at least each fiscal quarter, after accounting for reasonable reserves under Section 4.01, in proportion to each Member's Percentage Interest. Without limiting the foregoing, provided there are sufficient proceeds, each Member shall receive distributions necessary to satisfy their respective tax obligations for any income realized from the Company.

Section 4.06 **Non-cash Proceeds.** If the proceeds from a sale or other disposition of an item of the Company consists of property other than cash, the value of such property shall be as determined by the Members. Such non-cash proceeds shall then be allocated among all the Members in proportion to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash, such cash shall be distributed to each Member in accordance with Section 4.01.

Section 4.07 **Liquidation Distributions.** Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this ARTICLE IV, and other credits and deductions to the Members' Capital Accounts, shall be made before the final distribution is made. The final distribution to the Members shall be made to the Members to the extent of and in proportion to their positive Capital Account balances.

Section 4.08 **Guaranteed Payments to Obdulia, LLC.** Notwithstanding anything to the contrary, the Company shall make the following guaranteed payments to Obdulia, LLC:

> (a) No later than January 31, 2013, the Company shall make a guaranteed payment to Obdulia, LLC in the sum of $130,000 if the Gross Receipts for the calendar year 2012, equals or exceed $2,000,000.

> (b) No later than January 31, 2014, the Company shall make a guaranteed payment to Obdulia, LLC in the sum of $130,000 if the Gross Receipts for the calendar year 2013 equals or exceeds $3,000,000.

> (c) "Gross Receipts" as used in this Section 4.08 means actual funds received by the Company from its operations and ordinary course of business during the pertinent time period, calculated on a cash basis. Gross Receipts shall not include receipt of funds from non-operating activities such as loans and investment income.

## ARTICLE V.    MANAGEMENT AND OPERATIONS

Section 5.01 **Managing Member.** For so long as it constitutes a Majority of the Members, the following shall serve as the Managing Member:

514

Section 5.02 **Company's Management.** Except as otherwise set forth in this Agreement, including, without limitation Section 7.03 below, all decisions concerning the operation and management of the Company's business shall be made by the Managing Member. A declaration by the Managing Member, stating that it has approved any specific action concerning the management of the Company's business as set forth in this Section 5.02, shall be conclusive to any third party that a Majority of Members have approved such stated specific action and that the Managing Member is authorized to perform such action on behalf of the Company. The Managing Member may take any action set forth above by a written consent executed with or without a meeting. The Managing Member shall be authorized to obtain financing for the Business and sign and deliver any credit documents on behalf of the Company; provided however no Member shall cause the Company to incur a debt in excess of $20,000 without the unanimous consent of the Members.

Section 5.03 **Meetings.** The Members are not required to hold meetings, and decisions may be reached through one or more informal consultations followed by agreement among a Majority of Members, provided that all such Members are consulted (although all Members need not be present during a particular consultation), or by a written consent signed by a Majority of Members. In the event that Members wish to hold a formal meeting (a "Meeting") for any reason, the following procedures shall apply:

(a) Any two Members may call a Meeting of the Members by giving Notice of the time and place of the Meeting at least 48 hours prior to the time of the holding of the Meeting. The Notice shall reasonably specify the purpose, location and time of the Meeting.

(b) A Majority of Members shall constitute a quorum for the transaction of business at any Meeting of the Members.

(c) The transactions of the Members at any Meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a Meeting duly held after call and notice if a quorum is present and if, either before or after the Meeting, each Member not present signs a written waiver of Notice, a consent to the holding of the Meeting, or an approval of the minutes of the Meeting.

(d) Any action required or permitted to be taken by the Members under this Agreement may be taken without a Meeting if a Majority of the Members individually or collectively consent in writing to such action.

(e) Members may participate in the Meeting through the use of a conference telephone or similar communications equipment, provided that all Members participating in the Meeting can hear one another.

515

(f) The Members shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all Meetings, Notices, and waivers of Notices of Meetings, and all written consents in lieu of Meetings.

Section 5.04    **Assets.**  All assets of the Company, whether real or personal, may be acquired and held for the Company's purposes set forth in this Agreement in the Company name.

Section 5.05    **Payment of Taxes, Debts and Obligations.**  At all times prior to the termination or dissolution of the Company, the cash proceeds of the Company, together with any net reduction in the reserves of the Company, shall be allied first to the payment of all taxes, debts and other obligations and liabilities (including the interest on and the principal of any loan owing to any Member thereof) of the Company which are then due and owing, and the establishment of reasonable reserves for contingent and future liabilities and distributions of the Company, as determined by the Managing Member.

Section 5.06    **Delegation.**  The Managing Member may from time to time cause the Company to employ Persons, including any Affiliate of the Managing Member, to operate the business of the Company, including performing any function that the Managing Member would otherwise perform, and to pay such Person any fee that the Managing Member determines to be reasonable; provided, however, that no fee shall be paid to an Affiliate of a Member, except as otherwise provided in this Agreement.

Section 5.07    **No Compensation.**  No Member shall be entitled to any fees, commissions or other compensation from the Company for any services rendered to or performed for the Company, except as specifically provided in this Agreement, other ancillary agreements (including Employment Agreements with Members) or as approved by a Supermajority of Members in accordance with this Agreement.

Section 5.08    **Member's Indemnification.**  Each Member (the "Indemnifying Party") shall indemnify the Company and each other Member (the "Indemnified Party") for, and shall hold the Indemnified Party, and for, from and against, any and all liability to any Person incurred by the Indemnified Party by reason of any fraudulent, criminal, or grossly negligent act or omission of or breach of this Agreement by such Indemnifying Party or any of the shareholders, officers, agents, employees or Affiliates of such Indemnifying Party, and for, from and against all cost, expense and loss incurred by the Indemnified Party in connection therewith.

Section 5.09    **Company's Indemnification.**  The Company shall indemnify the Members for, and shall hold the Members harmless from and against, any liability of the Members to any Person arising or incurred in connection with the good faith discharge of the Members' obligations under this Agreement, except for liability imposed on the Members as a result of any fraudulent, criminal, or grossly negligent act or omission of or breach of this Agreement by the Members or any of the shareholders, officers, agents or employees of the Members.

Section 5.10    **Bank Accounts.**  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Managing Member.  Withdrawal from such accounts

516

shall require the signature of such person or persons as a Majority of Members may designate.

>(a) Any one Member where there are more than one, designated by a Majority of the Members, may from time to time open bank accounts in the name of the Company.

>(b) Only persons approved by the Majority of the Members shall have the authority to deposit and withdraw funds from any Company bank account, or sign checks or other instruments on behalf of the Company.

>(c) All funds of the Company shall be maintained in a bank account or accounts and no funds of the Company shall be commingled with funds or accounts of any Member, or person related to any Member.

>(d) No Member shall have the right to borrow money on behalf of any other party or the Company, or to use the credit of any other party or the Company, for any purpose, except as specifically set forth in this Agreement and for the advancement of the Business.

## ARTICLE VI.     ACCOUNTING RECORDS, AND TAX MATTERS

Section 6.01    **Fiscal Year.** The fiscal year of the Company shall be the calendar year.

Section 6.02    **Accounting Method.**    The books and records of the Company shall be maintained on the method of accounting chosen by the Members and otherwise in accordance with generally accepted accounting principles consistently applied and shall show all items of income and expense.

Section 6.03    **Company's Books.** Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours.   The costs of such inspection and copying shall be borne by the Member requesting same.

Section 6.04    **Financial Statements.** Financial books and records of the Company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes. A balance sheet, income statement, and tax returns of the Company shall be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement and copies thereof shall be distributed to the Members.

Section 6.05    **Company's Records.** At all times during the term of existence of the Company, and beyond that term if a Majority of Members deem it necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.03, and the following:

517

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b) A copy of the Certificate of Formation, as amended;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d) Executed counterparts of this Agreement, as amended;

(e) Any powers of attorney under which the Certificate of Formation or any amendments thereto were executed;

(f) Financial statements of the Company for the six most recent fiscal years; and

(g) The Books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

(h) If a Majority of Members deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by a Majority of Members.

Section 6.06 **Partnership Tax Election.** Each of the Members hereby recognizes that the Company will be recognized as a partnership for Federal and New Jersey tax purposes and will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code.

Section 6.07 **Tax Returns.** Within 60 days after the end of each taxable year, the Company shall send to each Member all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for such year. Subject to Section 4.01, the Company shall make minimum distributions to cover each Members tax liability arising out of income generated by the Company.

Section 6.08 **Tax Matters.** The Managing Member shall be the "tax matters partner" for purposes of the Code and shall notify the Members of any audit or other matters of which the Managing Member is notified or becomes aware.

## ARTICLE VII. MEMBERS' RIGHTS AND VOTING

Section 7.01 **No Authority.** Except as provided under Section 5.02above, or as provided otherwise with respect to the Member's duties or as specifically provided in writing by the all of

14

518

the Members, the Members shall not act in the name of or as the representative of the Company and shall not deal with the Company's assets in any way, and shall not incur any obligation for which the Company or the other Member will or may be liable, and the Members shall not otherwise bind the Company or the other Member, and any violation of this sentence shall be deemed to constitute willful misconduct.

Section 7.02    **Voting Proportion.**  Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date.

Section 7.03    **Prohibited Acts.**  Notwithstanding anything to the contrary in this Agreement, the following actions shall require the unanimous Vote of the Members:

>           (a) issuing additional ownership interests in the Company to new or existing Members or otherwise taking any actions which would dilute the Percentage Interests of the existing Members;

>           (b) the admission of the Assignee as a Substituted Member;

>           (c) any amendment of the Certificate of Formation or this Agreement; or

>           (d) entering into any contract with the Managing Member or Annapurna Maddali, or any affiliates, employees or family members of either (collectively, a "Related Party"), or otherwise paying or agreeing to pay any remuneration to any Related Party other than distributions to the Managing Member in its capacity as Member in accordance with the terms of this Agreement.

Section 7.04    **Record Date.**  The record date for determining the Members entitled to Notice of any Meeting, to vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by a Majority of Members, provided that such record date shall not be more than 60, nor less than 10 days prior to the date of the Meeting, nor more than 60 days prior to any other action.   In the absence of any action setting a record date the record date shall be determined in accordance with the applicable laws of Texas.

Section 7.05    **Proxy.**  At all Meetings of Members, a Member may Vote in person or by Proxy. Such proxy shall be filed with any Member before or at the time of the Meeting, and may be filed by facsimile transmission to the principal executive office of the Company or such other address as may be given by a Majority of Members to the Members for such purposes.

Section 7.06    **Intellectual Property.**  All copyrights, patents, web sites, trade names, trade secrets, or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, or works of authorship developed or created by the Member or the Members during the course of performing Company's work shall belong exclusively to Company and its Members and/or the third party end client and shall be considered a work made for hire.  Each Member herewith assigns, without any requirement of further consideration, any right, title, or interest that each such Member may have in such work product including any

15

copyrights, patents, trade secrets or other intellectual property rights pertaining thereto. Each Member will provide full information regarding the rights being assigned and will take such further actions, including but not limited to, execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

## ARTICLE VIII.  TRANSFERS OF MEMBERSHIP INTERESTS

Section 8.01  **Transfer Restrictions.**  Each Member acknowledges and agrees that the restrictions on the transfer of membership interest contained in this Agreement is a material factor in each Member investing in the Company and is necessary to maintain harmony, continuity, and success.

Section 8.02  **Withdrawal.** A Member may withdraw from the Company at any time by giving Notice of such Member's intent to withdraw to all other Members, at least 180 calendar days before the effective date of withdrawal.  Withdrawal shall not release a Member from any obligations and liabilities under this Agreement which were accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

Section 8.03  **Right of First Refusal.** Except as otherwise provided herein, no Member shall sell, transfer, pledge, encumber or otherwise dispose of her or his Membership Interest to any person, firm, Company or other entity, without the consent of the Company as determined by a Supermajority of the Members, unless the Member desiring to make the transfer or encumbrance, hereinafter referred to as the "Selling Member," shall have first made the offer to sell hereinafter described ("Offer"), and such Offer shall not have been accepted, and such transfer or encumbrance is ultimately made on the same terms set forth in the Offer.

(a) The Offer which shall be given to the Company and the other Member shall consist of an offer to sell all of the Membership Interest of the Company owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lien or, the percentage of Membership Interests involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bonafide Offer"), in accordance with the provisions of Section 8.03(b) hereof.

(b) If any such Selling Member has received a bonafide written offer to purchase all of her or his Membership Interest which she or he wishes to accept or a bona fide written offer to receive a loan or an advance of money which loan or advance involves an encumbrance upon said Membership Interest to secure the loan or advance as referred to in Section 8.03(a) above, the Selling Member shall submit to the Company within fourteen (14) days after receipt of such Bonafide Offer, a written notice including a copy of such Bonafide Offer, as required under Section 8.03(a) above, together with

16

the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bonafide Offerors"), and sufficient fact concerning the Bonafide Offerors to enable the Company and other Members of the Company to arrive at an informed judgment as to the bonafides of such Offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell, first to the Company all of the Membership Interest held by the Selling Member at the purchase price set forth in the Bonafide Offer ("Lifetime Purchase Price"), and upon the terms and conditions set forth therein; provided, however, the Selling Member has complied with all of the procedural conditions thereof. Within thirty (30) days after receipt by the Company of the Bonafide Offer, the Company may, at its option, elect to purchase or encumber all of the Membership Interest of the Selling Member which is the subject of the Bonafide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, any other Member of the Company may, within forty-five (45) days after the receipt by the Company of the Bonafide Offer, or Members pursuant to their pro rata interest in the Company (if more than one Member), elect to purchase or encumber, as the case may be, all of the Membership Interest of the Selling Member which is the subject of the Bonafide Offer for the Lifetime Purchase Price on the terms set forth in the Bonafide Offer. The Company shall exercise its election to purchase by giving written notice thereof to the Selling Member and the other Members. The other Members shall expose their election to purchase by giving written notice thereof to the Selling Member and to the Company. In either event, the notice shall specify a date for the closing of the purchase, which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance.

(c) If the offer to sell as provided for in Section 8.03(b) hereof is not accepted by the Company or any of the other Members as set forth therein, the Selling Member may make a bonafide transfer or encumbrance to the prospective purchaser or lien or named in the statement attached to the Bona Fide Offer with such sale or encumbrance to be made only in strict accordance with the terms stated therein. The Company and the other Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bonafide Offerors, so that adherence to the terms and conditions of the Bonafide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the other Member, in accordance with Section 8.03(b), or if there is any modification in price or any of the terms and conditions of the Bonafide Offer, such Membership Interest shall again become subject to all the restrictions of this Agreement, and the Selling Member shall not have the right to complete the

17

proposed sale of encumbrance without again offering the Membership Interest, in writing, anew to the Company and the other Member pursuant to the procedures set forth in this Section 8.03. Notwithstanding anything in this Agreement to the contrary, all Membership Interest purchased by the Bonafide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bonafide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Membership Interest purchased, or any other Membership Interest thereafter held or owned, without the prior written consent of the other Member of the Company as determined by a Supermajority of the Members, and otherwise except as specifically provided in this Agreement. It shall be the affirmative obligation of the Selling Member to notify the Bona fide Offerors that the Membership Interest proposed to be sold by the Selling Member and purchased by the Bonafide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

(d) In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition of Membership Interest by any Member not in accordance with the terms of this Agreement, shall be deemed null and void and of no effect.

(e) At the time of closing, as set forth in this Section 8.03, the Selling Member shall deliver to the purchaser, certificates representing all of the Membership Interest owned by the Selling Member, free and clear of all liens, claims and encumbrances, duly executed Assignment of Membership Interest with any necessary Membership Interest transfer charges or stamps affixed, in order to effectuate the sale and purchase.

Section 8.04  **Transfer Conditions.**  Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest in the Company, whether now owned or hereafter acquired, unless (1) the Company and/or other Members have exercised, or have declined to exercise, their right to purchase the withdrawing Member's Membership Interest pursuant to Section 8.03(b) above and (2) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Act or revocation of the Company's tax election as a partnership Subchapter "K" of the Code. No Member may encumber or permit or suffer any encumbrance of all or any part of the Member's Membership Interest in the Company unless such encumbrance has been approved in writing by all the other Members. Any transfer or encumbrance of a Membership Interest in violation of this Section shall be void. Notwithstanding any other provision of this Agreement to the contrary, provided the transfer does not result in a change in the Company's partnership status, a Member may transfer all or any portion of his or her Membership Interest to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's

522

spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in such Membership Interest. A transfer of a Member's beneficial interest from such trust to another entity, or failure to retain such Voting Interest shall be deemed a Transfer of a Membership Interest, unless such later transfer is to the grantor of such trust, or to another trust which would qualify as a revocable trust in a first-time transfer.

Section 8.05 **Triggering Events.** On the happening of any of the following events ("Triggering Events") with respect to a Member, and assuming the remaining Members vote to continue the Company per ARTICLE IX below, the Company, first, and the other Members in proportion to their respective percentage of Membership Interests, second, shall have the option to purchase all or any portion of the Membership Interest in the Company of such Member ("Selling Member") at the price and on the terms provided in Section 8.08 of this Agreement:

> (a) the bankruptcy of a Member;

> (b) the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity;

> (c) the withdrawal of a Member; and

> (d) except for the events stated in Section 8.03, the occurrence of any other event that is, or that would cause, a transfer of such Member's interest to an Assignee.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

Section 8.06 **Company's Election to Purchase.** On the receipt of Notice by the other Members as contemplated by Section 8.03 through Section 8.05, and on receipt of actual notice of any Triggering Event, the Company, first, and the other Members in proportion to their respective percentage of Membership Interests, second, shall have the option, but not the obligation, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.08, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms provided in Section 8.08, and the other Members, pro rata in accordance with their prior Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase. Any Membership Interest in the Company not purchased may be transferred to an Assignee, but such Assignee shall not become a Substituted Member without the approval of all Members according to Section 7.02 above. The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

19

523

Section 8.07    **Voting Restriction.**  No Member shall participate in any Vote or decision in any matter pertaining to the disposition of that Member's Membership Interest in the Company under this Agreement.

Section 8.08    **Purchase Price.**  The purchase price of the Membership Interest that is the subject of an option per Section 8.06 above shall be the Fair Market Value of such Membership Interest as determined under this Section 8.08.  Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree on the Fair Market Value.  If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option Date), the selling party shall appoint, within 20 days of the Option Date, one appraiser, and the purchasing party shall appoint within 20 days of the Option Date, one appraiser.  The two appraisers shall within a period of five additional days, agree on and appoint an additional appraiser.  The three appraisers shall, within 30 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their report to all the parties. The Fair Market Value shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value.  The selling and purchasing party shall pay for the services of the appraiser selected by it, plus one-half of the fee charged by the third appraiser. The option purchase price as so determined shall be payable in cash no later than three (3) months following the determination of the appraisers' determination of the purchase price.

Section 8.09    **Substituted Member.**  Except as expressly permitted under Section 8.03, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (a "Substituted Member") only (1) on the Supermajority  Vote of the other Members in favor of the prospective transferee's admission as a Member, and (2) on such prospective transferee's executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member. Any person admitted to the Company as a Substituted Member shall be subject to all provisions of this Agreement.

Section 8.10    **No Registration.**  The initial sale of Membership Interests in the Company to the initial Members has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended, in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of Membership Interests to Members under the securities or corporate laws of Texas. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred or Encumbered unless registered or qualified under applicable state and federal securities law or unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

Section 8.11    **Drag Along.**  In the event that a majority of the Members ("Majority Members") of the outstanding interest accept an offer to purchase their Interest from a bona fide third party, the Majority Members may send a written notice (the "Drag-Along Notice") to the other Interest Holders (the "Drag-Along Sellers") specifying the name of the purchaser, the consideration

20

payable per share and a summary of the material terms of such proposed purchase. Upon receipt of a Drag-Along Notice, Each Drag-Along Seller shall be obligated to: (i) sell all of its Interest, free of any encumbrances, in the transaction contemplated by the Drag-Along Notice on the same terms and conditions as the Majority Members (including payment of its pro-rata share of all costs associated with such transaction), and (ii) otherwise take all necessary action to cause the consummation of such transaction, including voting its interest in favor of such transaction and not exercising any appraisal rights in connection therewith. Each Drag-Along Seller (i) further agrees to take all actions (including executing documents) in connection with consummation of the proposed transaction as may be reasonably requested of it by the Majority Members, and (ii) hereby appoints the Majority Holders, acting jointly, as its attorney-in-fact to do the same on its behalf.

Section 8.12 **Transfer by Obdulia, LLC upon Termination of the Employment Agreement.**

(a) Upon the termination of the Employment Agreement due to an Involuntary Termination (as defined in Section 7 of the Employment Agreement), death of the employee, nonrenewal of the Employment Agreement after expiration of the initial term of employment, Other Than for Cause (as defined in Section 8 of the Employment Agreement) or termination by Employee for Good Reason (as defined in Section 8 of the Employment Agreement), then no later than fourteen (14) days of the Termination Date (as defined in Section 11 of the Employment Agreement), the Company shall buy and Obdulia, LLC shall sell all of its membership interests in the Company at the higher of Fair Market Value or the balance of Obdulia, LLC's capital account as of the Termination Date.

(b) Upon the termination of Employment Agreement due to Termination for Cause (as defined in Section 9 of the Employment Agreement) or due to Employee electing to terminate his employment other than for Good Reason (as defined in Section 10 of the Employment Agreement), then no later than fourteen (14) days of the Termination Date, the Company shall buy and Obdulia, LLC shall sell all of its membership interests in the Company at the lower of the Fair Market Value or the balance of Obdulia, LLC's capital account in the Company as of the Termination Date.

(c) In the event the purchase price for the sale of Obdulia, LLC's shares exceeds $50,000, the Company shall have the right to pay for the purchase price of the Employee's membership interests by providing a 25% down payment and financing the remaining portion over five (5) years to be secured by a promissory note. The promissory note shall be fully amortizing and require monthly installments over a period of five (5) years, with interest being imposed at the annual rate equal to the Prime Rate (as published in the Wall Street Journal) of interest in effect as of the Closing Date plus

21

525

two (2%) percent, and shall be adjusted annually thereafter on each successive anniversary of the Closing Date. The monthly installments shall be due at on the first day of each calendar month and the holder of the Note shall be entitled to prepaid interest at the Closing, if applicable. The promissory note shall provide for acceleration of the unpaid balance, together with all accrued interest, upon written notice to the Company of a default in the payment of any one monthly installment, which default remains unsecured for a period of thirty (30) days. The Company shall possess the unrestricted right to prepay all or any part of the promissory note, without premium or penalty, and with interest only to "date of payment".

Section 8.13   **Restrictions on Transfer of Obdulia, LLC's Membership Interests.**   The Parties understand and agree that the Company is engaged in a business that is highly regulated, that require, inter alia, notice requirements for change of ownership and background checks of all owners. Therefore, Obdulia, LLC agrees that no member of Obdulia, LLC shall be allowed to transfer their membership interests in Obdulia, LLC without the prior written consent of the Company, which consent shall be withheld only if the proposed transferee will have an adverse effect on the Company's licenses and/or qualifications with regulatory authorities and other third party payers.


## ARTICLE IX.    DISSOLUTION AND WINDING UP

Section 9.01   **Dissolution.**   The Company shall be dissolved on the first to occur of the following events:

(a) The written agreement of all Members to dissolve the Company.

(b) The sale or other disposition of substantially all of the Company assets.

(c) The entry of a decree of judicial dissolution by any Texas Court.

Section 9.02   **Winding Up.**   On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Members who have not caused a Triggering Event shall wind up the affairs of the Company. The Persons winding up the affairs of the Company shall give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except loans owing to Members) the remaining assets of the Company shall be distributed or applied in the following order of priority:

(a) To pay the expenses of liquidation.

22

526

(b) To repay outstanding loans from Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid on those loans. Such repayment shall first be credited to accrued and unpaid interest due and the remainder shall be credited to principal.

(c) Among the Members in accordance with the provisions of Section 4.06.

Section 9.03 **No Recourse against Members.** Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of all prior debts and obligations is consumed in full, then such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

## ARTICLE X. GENERAL PROVISIONS

Section 10.01 **Complete Agreement.** This Agreement constitutes the whole and entire agreement of the Members with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the Members. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

Section 10.02 **Counterparts.** This Agreement may be executed in one or more counter parts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 10.03 **Choice of Law; Forum.** This Agreement shall be construed and enforced in accordance with the internal laws of the State of Texas. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect. The intent of the parties hereto is that the Company is recognized as a limited liability company under the Code, and all provisions herein are to be interpreted under Texas law to conform to such intent.

Section 10.04 **Arbitration.** Except as otherwise provided in this Agreement, any dispute, controversy or claim arising out of or relating to this Agreement, or any breach thereof, including without limitation any claim that this Agreement, or any part hereof, is invalid, illegal or otherwise voidable or void, shall be submitted to binding arbitration by an American Arbitration Association ("AAA") arbitrator, or such other arbitrator as may be agreed upon by the parties. Hearings on such arbitration shall be conducted in Bexar County in the State of Texas or if no arbitrator is available in such county, any county in the State of Texas. A single arbitrator shall

23

527

arbitrate any such controversy. The arbitrator shall hear and determine the controversy in accordance with applicable law and the intention of the parties as expressed in this Agreement, upon the evidence produced at an arbitration hearing scheduled at the request of either party. Judgment on the award of the arbitrator may be entered in any court having jurisdiction thereof.

(a) <u>Power And Authority Of Arbitrator</u>. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law.

(b) <u>Governing Law</u>. All questions in respect of procedure to be followed in conducting the arbitration as well as the enforceability of this Agreement to arbitrate which may be resolved by state law shall be resolved according to the laws of the State of Texas.

Section 10.05 **Binding Effect.** This Agreement shall be binding on and inure to the benefit of the Members and their heirs, personal representatives, and permitted successors and assigns.

Section 10.06 **Pronouns; Statutory References.** All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Act or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

Section 10.07 **Notices.** Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall be served personally or delivered by first class, registered or certified, return receipt requested U.S. mail, postage prepaid. Notices may also be given by transmittal over electronic transmitting devices such as Telex, facsimile or telecopy machine, if the party to whom the notice is being sent has such a device in its office, provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received at the earlier of actual receipt or three (3) days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Company at the Company's principal place of business as specified in Section 2.04 of this Agreement, and to the Members at the addresses shown in the first page of this Agreement provided a Member may change such Member's address for notice by giving written notice to all other Members in accordance with this Section 14.15.

Section 10.08 **Additional Documents and Acts.** The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the Members.

Section 10.09 **No Authority.** Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

528

Section 10.10 **Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

Section 10.11 **Requisite Authority.** Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

Section 10.12 **Headings.** The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

Section 10.13 **No Third Party Beneficiaries.** This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

*[Signatures follow on next page]*

529

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement of CRAWFORD HUNTLEIGH MEDICAL SUPPLIES, LLC on the day and year first above written.

**COMPANY:**

CRAWFORD HUNTLEIGH MEDICAL
SUPPLIES, LLC

By: _____
　　　PREM SWAROOP KALIDINDI,
　　　Authorized Representative

**MEMBER(S):**

_____
PREM SWAROOP KALIDINDI

_____
ANNAPURNA MADDALI

**OBDULIA, LLC**

By: _____
　　　Richard P. Flores, Man. Member

26

# EXHIBIT A

## Membership Interest Table

| Name | Capital Contribution | Percentage |
|---|---|---|
| **PREM SWAROOP KALIDINDI** | $187.50 | 18.75% |
| **ANNAPURNA MADDALI** | $562.50 | 56.25% |
| **OBDULIA, LLC** | $250.00 | 25% |

27

# Tab 3

CAUSE NO. 2013-CI-00404

| | | |
|---|---|---|
| HUNTLEIGH HOME MEDICAL, LTD. | § | IN THE DISTRICT COURT |
| AND JANE ELIZABETH FLORES, AND | § | |
| MICHAEL FLORES, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 57TH JUDICIAL DISTRICT |
| | § | |
| CRAWFORD MEDICAL SUPPLIES, LLC, | § | |
| SRINIVAS "SAM" MADDALI, | § | |
| PREM SWAROOP KALIDINDI, AND | § | |
| MADDALI REALTY, LLC, | § | |
| | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

## PLAINTIFFS' THIRD AMENDED PETITION

TO THE HONORABLE COURT:

Plaintiffs Huntleigh Home Medical, Ltd., Jane Elizabeth Flores and Michael Flores file this third amended petition and would respectfully show:

### DISCOVERY LEVEL

The parties are conducting discovery under a Level 3 discovery control plan.

### PARTIES

Plaintiff **Huntleigh Home Medical, Ltd.** ("Huntleigh") is a Texas limited partnership.

Plaintiff **Jane Elizabeth Flores** is an individual resident of Bexar County, Texas.

Plaintiff/Counter-plaintiff **Michael Flores** is an individual resident of Bexar County, Texas.

Defendant **Crawford Medical Supplies, LLC** ("CMS") is a Texas limited liability company and has already entered an appearance in this case.

Defendant **Sam Maddali** is an individual who, upon information and belief, is a resident of New Jersey. He has already entered an appearance in this case.

425

Defendant **Prem Swaroop Kalidindi** is an individual who, upon information and belief, is a resident of Texas. He has already entered an appearance in this case.

Defendant **Maddali Realty, LLC** ("Maddali Realty") is a Texas limited liability company and has already entered an appearance in this case.

## JURISDICTION

This Court has jurisdiction over Defendants CMS and Maddali Realty because they are both Texas limited liability companies. The Court has jurisdiction over Defendant Kalidindi because, upon information and belief, he is a Texas resident, and because he is the managing member of CMS.

This Court has personal jurisdiction over Defendants Maddali and Kalidindi because Plaintiffs' causes of action arise from and relate to their contacts with Texas, and because they purposefully availed themselves of the privilege of conducting activities in Texas.

Maddali traveled to Texas on many occasions to meet with Plaintiffs Jane Elizabeth "Belle" Flores and her son, Michael Flores. All of these meetings concerned Huntleigh and the assets at issue in this case. Maddali committed wrongful actions complained of in this petition in Texas.

Even if Kalidindi were a resident of another state, the same analysis applies to him. He also traveled to San Antonio on many occasions to meet with Plaintiffs. All of these meetings concerned Huntleigh and Huntleigh assets. Kalidindi committed wrongful actions complained of in this petition in Texas.

Maddali and Kalidindi have committed torts, in whole or in part, in Texas. This includes making misrepresentations in Texas that give rise, in whole or in part, to Plaintiffs' claims. They made these misrepresentations to Michael Flores, who they knew was a Texas resident, and to

2

426

Huntleigh, who they knew was a company based wholly in Texas, with the intent to wrongfully deprive Plaintiffs of assets located in Texas. Maddali also ordered an employee he knew was in Texas to purposefully interfere with a contract between two Texas companies. Kalidindi signed an employment contract with Michael on behalf of CMS in Texas, and did so at a time at which he had no intention (and therefore CMS had no intention) of complying with the agreement. Maddali and Kalidindi undertook contacts with Texas by purposefully availing themselves of the privilege of conducting activities here, and their liability arises from or relates to those contacts.

Maddali and Kalidindi have also subjected themselves to the general jurisdiction of Texas courts because Maddali owns or controls several Texas companies, including Maddali Realty, and regularly conducts business in this state. Kalidindi lives in Texas or spends substantial time here.

Maddali and Kalidindi have purposefully availed themselves of the privilege of conducting activities within Texas, and the Court's assertion of jurisdiction over them meets traditional notions of fair play and substantial justice.

The damages at stake are within the jurisdictional limits of the Court.

### VENUE

Venue is proper in Bexar County, Texas because that is the county in which:

a. all or a substantial part of the events or omissions giving rise to the claims occurred;

b. CMS has its principal place of business;

c. Huntleigh has its principal place of business; and

d. Plaintiffs Belle Flores and Michael Flores have their residences.

3

427

## BACKGROUND FACTS

Defendants convinced Plaintiffs they wanted to work together to build a new home health care company. Once Defendants were able to gain Plaintiffs' confidence however, they took everything they could from Huntleigh and pushed Michael and Belle aside.

Before Defendants came into the picture, Huntleigh had provided high quality home health care services to patients in the San Antonio area since 1981. Michael Flores and his mother, Jane Elizabeth "Belle" Flores, are the principals of Huntleigh.

Maddali wanted to get involved in the health care industry in San Antonio and reached out to Michael and Belle to buy Huntleigh. They expressed interest, and provided Maddali information about Huntleigh – including the fact that the IRS asserted a tax lien against Huntleigh. In connection with the negotiations, Plaintiffs provided Maddali, and later Kalidindi, with valuable trade secrets, including Huntleigh's customer list and customer information, billing software, customer contracts, pricing data, supplier and vendor lists (the "Trade Secrets").

Maddali then said he was no longer interested in buying Huntleigh's operations, but instead proposed to start a new home health care company with Huntleigh, Michael and Belle. The parties – Maddali, Michael, Belle, and Huntleigh – agreed that they would begin the process of starting the new home health care company and all that required, such as gaining accreditation and negotiating contracts with third party payors, while Huntleigh wound down its operations. Maddali proposed that he and his people be allowed to use Huntleigh's offices to do so, and that Huntleigh provide employees and other support during the transition period. In turn, Maddali agreed to provide support for Huntleigh to allow it to wind down its operations, including providing business expertise and, if necessary, financing. Plaintiffs agreed. Maddali told Plaintiffs they could trust him, saying he "always made a success from [his] business dealings."

4

428

The parties agreed that Michael would be an employee of the new entity, and would help start the new entity's operations, while continuing to manage Huntleigh's operations. Before the new entity was ready to begin operations, Huntleigh would continue to take care of its existing patients, meet its obligations under existing contracts, bill for its services and collect payments.

The parties agreed that, when the new entity was ready to begin operations, after it had gained accreditation and secured contracts from payors, Plaintiffs would assist the new entity in possibly taking over Huntleigh's existing patients. The patients would have to agree, but if they did, the new entity would be able to seamlessly transition care to itself from Huntleigh, thereby ensuring continuous care for the patients. Huntleigh had equipment out on rent to these patients, and the parties agreed that, for those patients who agreed to transfer their care from Huntleigh to the new entity, Maddali would simply buy from Huntleigh its equipment that was out on rent to these patients. The parties agreed that Maddali would pay a reasonable, fair market value for the equipment and other Huntleigh assets at the time it needed it.

As an employee, Michael would help the new entity ramp up its back office operations, including using setting up billing software and other requirements for the new entity to bill for its services and collect payments. In the meantime, Huntleigh was to continue providing care and collecting for its work.

In December 2011, the new entity, Crawford Huntleigh Medical Supplies, LLC[1] ("CMS"), came into existence. Michael became an employee of CMS as the parties had agreed.

Maddali brought several people in to Huntleigh's facility, including Kalidindi and Nanda Katepalli, to work on CMS' preparations, and Michael began helping them as the parties agreed.

---

[1]    Maddali later dropped "Huntleigh" from the name of the entity, changing it to Crawford Medical Supplies, LLC.

429

For instance, Michael was successful in getting accreditation for CMS from the Accreditation Commission for Health Care, Inc., a vital step for doing business in the home health care field. Maddali also provided Michael a template contract for Huntleigh to "share" staff with CMS.

Also in March 2012, Michael began working on Huntleigh's Medicare Part B Competitive Bidding application. CMS could not participate in the Competitive Bidding process because it did not have a Medicare Provider number, and it could only begin to pursue a Medicare Provider number after it was accredited. On March 9, 2012, due in large part to Michael's expertise and efforts, CMS passed its accreditation. But Defendants still needed Plaintiffs' help, because it would still take months for CMS's Medicare Provider Number application to be processed. CMS could not bill Medicare until it acquired this number.

While they were happy to accept the benefits of Michael's efforts on behalf of CMS, Maddali and Kalidindi began to interfere with Michael's ability to wind down the operations of Huntleigh as the parties had agreed. Instead, they set about to force Huntleigh to pay the bills, keep the revenues for themselves, and simply take Huntleigh's assets.

**Defendants ruin the Hospice Source deal**

In December 2011, Huntleigh Home Medical received notice that it was losing a contract with Odyssey Hospice. The new company taking over the contract, Hospice Source, offered to buy the Huntleigh equipment that was out on rent to over 300 patients. Hospice Source conducted due diligence on the equipment by riding with Huntleigh delivery personnel to review the brand and quality of the Huntleigh equipment.

On January 13, 2012, Huntleigh and Hospice Source agreed that Hospice Source would buy the equipment being used by those patients. Hospice Source agreed to pay $110,000 for the

6

430

equipment.

Soon thereafter, Maddali learned of the Huntleigh equipment sale to Hospice Source and had to figure out a way to kill it, because he planned on simply taking the Huntleigh equipment for CMS. On Maddali's orders, a CMS employee cancelled the Hospice Source contract. This cost Huntleigh $110,000, but more importantly to Defendants, allowed them to keep the equipment.

### Defendants take Huntleigh equipment and assets

After stopping the Hospice Source deal, Maddali ordered CMS employees to take the Huntleigh labels and other identifying information off of the equipment and put on CMS labels. Maddali said this would fool the banks and the IRS, and would allow CMS to simply take them free and clear.

In April 2012, Maddali again came to San Antonio with the intent to solidify his hold on the Huntleigh assets. He told Huntleigh employees that revenues coming in for Huntleigh patients using Huntleigh equipment now belonged to CMS. He prevented employees from paying Huntleigh expenses.

### Defendants take over the Frost Bank account

Huntleigh had for years held its operating account at Frost Bank. In April 2012, Maddali asked Michael for access to the Frost Bank account. Michael agreed because Maddali told him he would have his manager Nanda Katepalli handle office matters, and that Michael was more valuable as a salesman generating business.

It did not take Maddali long to take advantage of his control over the Frost account. In August 2012, the account became perilously low for payroll. Kalidindi demanded Michael deposit Huntleigh funds to cover payroll, even though CMS was now using former Huntleigh

7

431

employees to carry out its business.

Huntleigh negotiated with the IRS to settle the tax lien for a relatively small amount. The IRS settlement was only available as long as Huntleigh paid all current taxes as they came due.

Now that they had control over the Frost Bank account however, Defendants simply took the money that would and should have gone to pay the IRS agreement and current taxes. Michael asked Defendants to leave at least enough funds in the account to cover the taxes, but they refused.

Defendants interfered with Huntleigh's ability to satisfy not only the IRS settlement, but also its ability to make current tax payments, by taking Huntleigh's money and receivables.

### Defendants push Michael and Belle out

By September 2012, Maddali had gained enough levers of control over Huntleigh to start moving Michael and Belle out. He told Michael he was not to be involved in any negotiations for CMS. He also directed Michael to stay out of any negotiations on behalf of Huntleigh.

On September 17, 2012, Michael expressed concern to Kalidindi that he was taking revenues owed to Huntleigh and using them to pay CMS bills.

Kalidindi assured Michael that CMS would take over payroll starting on September 17, 2012. Michael agreed to have Huntleigh issue payroll checks covering payroll up until that date, and that was supposed to be Huntleigh's last payroll processing.

On October 3, 2012, Nanda demanded Michael have Huntleigh process payroll under Huntleigh. CMS had already agreed it would cover payroll starting September 17, so Michael refused Nanda's demand. Kalidindi became incensed. He told Michael that CMS would not process payroll, and that Michael needed to tell "his" staff that they are not getting paid. CMS also refused to pay Michael his salary.

8

A few weeks after forwarding Huntleigh's mail to his house, Michael noticed he was receiving an unusually low volume of mail for Huntleigh. After checking with the post office, he discovered CMS had falsely told the postal carrier the change of address form was invalid, and demanded that Huntleigh mail be delivered to CMS. While Michael was eventually able to get the Huntleigh mail forwarded to him, Defendants had received Huntleigh mail, including checks for Huntleigh.

On October 5, 2012, Defendants had completed their plan to gut Huntleigh, and barred Michael and Belle from the premises.

Since Defendants' takeover, they have acted in concert to launder funds belonging to Plaintiffs. Maddali Realty is a limited liability company owned and controlled by Sam Maddali and his wife. Defendants transferred to Maddali Realty at least $37,000 in 2013, with over $23,000 transferred in December 2013 alone.

## CAUSES OF ACTION

### BREACH OF CONTRACT/QUANTUM MERUIT – The Maddali Agreement - all Plaintiffs against Maddali

Huntleigh, Michael and Belle agreed with Maddali to start a new home health care company, which eventually became CMS. Michael would help with the start-up, such as helping gain accreditation and negotiating contracts with third party payors. Plaintiffs would allow Maddali to use Huntleigh's offices while CMS was starting the paperwork necessary to become a home health care company, and Maddali would allow Huntleigh to continue its business while it wound down its operations. Maddali agreed to provide Huntleigh support, both business expertise and financing, in exchange for use of the Huntleigh facility and for assistance in transferring operations to CMS.

9

433

Michael would be an employee of the new entity, and would help start the new entity's operations, while continuing to manage Huntleigh's operations. Before the new entity was ready to begin operations, Huntleigh would continue to take care of its existing patients, meet its obligations under existing contracts, bill for its services and collect payments.

The parties agreed that, when the new entity was ready to begin operations, after it had gained accreditation and secured contracts from payors, Plaintiffs would assist the new entity in possibly taking over Huntleigh's existing customers. The customers would have to agree, but if they did, the new entity would be able to seamlessly transition care to itself from Huntleigh, thereby ensuring continuous care for the patients. CMS would pay a reasonable price for the Huntleigh equipment, inventory, and other assets.

As an employee, Michael would help the new entity ramp up its back office operations, including using setting up billing software and other requirements for the new entity to bill for its services and collect payments. Belle would also provide her business expertise in helping start the new entity. In the meantime, Huntleigh was to continue providing care and collecting for its work.

Maddali breached this contract (the "Maddali Agreement") by refusing to allow Plaintiffs to wind down the operations. Instead, he took or ordered the other Defendants to simply take Huntleigh's assets. He also refused to pay for the Huntleigh equipment and its other assets.

Maddali's breach caused damages to Plaintiffs.

In the alternative, Maddali is liable to Plaintiffs under quantum meruit.

BREACH OF CONTRACT/QUANTUM MERUIT – The Employment Agreement - Michael against CMS

CMS entered into an employment contract with Michael, under which it agreed to pay

10

him an annual salary. Michael performed his part of the bargain, but never received any payment for his services. CMS breached the contract by failing to pay, and owes Michael under the contract.

In the alternative, CMS is liable to Michael under quantum meruit.

PROMISSORY ESTOPPEL - all Plaintiffs against Maddali

Maddali is also liable for promissory estoppel. He promised to provide support for Huntleigh, both financial and business consulting expertise, in continuing and winding down its operations. He promised to allow Michael and Belle to continue winding down Huntleigh operations if they allowed him to use Huntleigh office space and if they helped start the new health care entity. He also promised to pay Huntleigh a reasonable cost for its equipment and other property that it would use. All Plaintiffs relied on these promises to their detriment. Plaintiffs allowed Maddali to use Huntleigh's offices, and provided material support in starting the new health care entity. Plaintiffs also provided Maddali access to Huntleigh's Trade Secrets.

Maddali should have known that Plaintiffs would rely on these statements, and injustice can be avoided only by enforcing Maddali's promises.

CONVERSION – Huntleigh against all Defendants

Defendants are liable for conversion. Huntleigh owned, possessed and had a right to immediate possession of its property (the "Property"), including:

a.    equipment;

b.    inventory;

c.    bank accounts and accounts receivable; and

d.    Trade Secrets.

Defendants have wrongfully exercised dominion or control over the Property, and

11

435

Huntleigh has suffered damages due to Defendants' wrongful actions.

TORTIOUS INTERFERENCE WITH CONTRACT – The Maddali Agreement – Plaintiffs against CMS and Kalidindi

These Defendants' interference with Plaintiffs' agreement with Maddali constitutes tortious interference. Their interference was willful and intentional, and their actions proximately caused damages to Plaintiffs.

TORTIOUS INTERFERENCE WITH CONTRACT – The Hospice Source Agreement - Huntleigh against all Defendants

Defendants' interference with Huntleigh's contract with Hospice Source constitutes tortious interference with contract. Defendants' interference was willful and intentional, and its actions proximately caused Huntleigh to lose that contract. Huntleigh suffered damages as a result.

MISAPPROPRIATION OF TRADE SECRETS – Huntleigh against Maddali, Kalidindi, and CMS

These Defendants' actions and representations shown in this petition also constitute common-law misappropriation of Huntleigh's Trade Secrets.

These Trade Secrets, including its customer list and customer information, customer contracts, billing software, pricing data, supplier and vendor lists. Defendants used or disclosed this proprietary information without authorization after acquiring it by improper means or through breach of a confidential relationship. Huntleigh provided Defendants with access to its trade secrets because Maddali said he wanted to buy Huntleigh or its assets, or because Defendants represented they wanted to use Huntleigh's facility only to start CMS. Instead, Defendants wrongfully used the trade secrets to take over Huntleigh's existing operations and to profit themselves. Huntleigh suffered damages as a result.

436

Huntleigh used and had the right to use this proprietary information in its business of home health care.

FRAUD/FRAUD BY NONDISCLOSURE/FRAUDULENT INDUCEMENT – all Plaintiffs against Maddali, Kalidindi and CMS

These Defendants are liable for common-law fraud. Defendants made representations that were materially false. These statements included Maddali telling Plaintiffs and Michael he wanted to work with them to start a new home health care company, and that he would allow Huntleigh to wind down its operations while the new entity got started. He also told them that, when the new entity was ready to begin operations, Huntleigh would be paid for the equipment and other assets it would use in its operations. He also told them they could trust Maddali. Kalidindi assured Plaintiffs CMS would start making payroll on September 17, 2012. They also misrepresented that they would pay reasonable value for Huntleigh equipment and inventory. They made these statements both before and after CMS was formed, and before and after they began using the Huntleigh offices. These statements were false.

Maddali and Kalidindi (and therefore CMS) knew these representations were false, and that they were simply using Michael and Belle to gain access to, and ultimately take, Huntleigh's Property. In the alternative, they made these representations recklessly, as positive assertions, and without knowledge of their truth.

Plaintiffs relied on these representations to their detriment and they suffered damages.

In the alternative, Defendants concealed certain facts from Plaintiffs that they had a duty to disclose, including the fact they had no intention of starting a new home health care company with Michael and Belle, and simply wanted to use them to gain access to, and to ultimately take, Huntleigh's Property without paying for it.

13

Defendants were deliberately silent when they had a duty to speak on these issues, and by failing to disclose these facts, intended to induce Plaintiffs to take some action or refrain from acting. Plaintiffs relied on these nondisclosures and suffered injuries as a result.

NEGLIGENT MISREPRESENTATION – all Plaintiffs against Maddali, Kalidindi, and CMS

Defendants' actions and representations shown in this petition also constitute negligent misrepresentations.

CIVIL CONSPIRACY – all Plaintiffs against all Defendants

Defendants conspired to defraud Plaintiffs, take Huntleigh's Property, and commit the acts outlined in this petition. They agreed to steal Huntleigh's Property to the detriment of Plaintiffs.

Additionally, Belle is the assignee of a UCC granted in favor of Jefferson State Bank against Huntleigh and its assets, and is therefore a secured creditor of Huntleigh. Defendants' actions constitute civil conspiracy to defraud Belle as a secured creditor, by taking Huntleigh assets. This is a conspiracy to commit fraud, to hinder, delay or defraud creditors, and to commit fraudulent conveyance, among others.

Defendants were members of a combination of two or more persons, the object of which was to accomplish an unlawful purpose or a lawful purpose by unlawful means. The members had a meeting of the minds on the object or course of action, and one of the members committed an unlawful, overt act to further the object or course of action. These acts include:

a.   changing the identification numbers and other identifiers on Huntleigh's equipment;

b.   obtaining Huntleigh's mail by deception or other unlawful means, violating 18 U.S.C. 1701 and 1708;[2]

---

[2]   Plaintiffs make no claims under federal law.

14

c.      defrauding the IRS by converting or transferring assets that otherwise could be used to satisfy the IRS lien;

d.      unlawfully interfering with Huntleigh's contract with Hospice Source;

e.      unlawfully interfering with the Maddali Agreement;

f.      unlawfully interfering with Michael's employment agreement;

g.      taking or converting Huntleigh's Property;

h.      transferring to themselves funds that belonged to Huntleigh or were generated using Huntleigh assets;

i.      other unlawful actions shown in this petition.

In a civil conspiracy, each defendant is liable for his or her own acts and for acts done by coconspirators in furtherance of the unlawful combination. Defendants are jointly and severally liable for all damages suffered by Plaintiffs.

FRAUDULENT TRANSFER ACT – Belle against all Defendants

Defendants' actions in taking or conveying Huntleigh's assets are fraudulent transfers under the Uniform Fraudulent Transfer Act, Texas Business & Commerce Code Chapter 24. Belle is entitled to all relief under section 24.008 of that chapter.

Defendants transferred assets of Huntleigh with the actual intent to hinder, delay, or defraud Belle, who was a creditor of Huntleigh, or without receiving a reasonably equivalent value in exchange for the transfer or obligation. Defendants intended to have Huntleigh incur, or believed or reasonably believed that Huntleigh would incur, debts beyond its ability to pay as they became due.

Defendants took Huntleigh's Property, or conveyed it to themselves, including cash, accounts receivable, equipment, and Trade Secrets. Defendants knew that Huntleigh was winding down its business and that these actions would cause Huntleigh to incur debts beyond its

15

439

ability to pay as they came due. Huntleigh did not receive a reasonably equivalent value in exchange for these transfers.

Belle's claim arose in October 2012, and these transfers occurred after this time. Further, Huntleigh did not receive reasonably equivalent value in exchange for the transfer and Huntleigh was either insolvent at the time of these transactions or became insolvent as a result of these transactions.

For instance, Defendants changed the identification labels on Huntleigh's equipment in January 2013. Defendants transferred to Maddali Realty at least $37,000 in 2013, with over $23,000 transferred in December 2013 alone. Because they have conspired to commit the actions outlined in this petition, each Defendant is jointly and severally responsible for all such actions.

ASSISTING AND ENCOURAGING/ASSISTING AND PARTICIPATING/AIDING AND ABETTING – all Plaintiffs against all Defendants

All Defendants were aware that they would take Huntleigh's Property, and all intended to, and did, assist. Defendants' actions were a substantial factor in causing the harm to Plaintiffs. Defendants are jointly and severally liable for all damages suffered by Plaintiffs.

UNJUST ENRICHMENT – all Plaintiffs against all Defendants

Defendants were unjustly enriched when they obtained benefit from Plaintiffs by fraud, duress, or the taking of an undue advantage. All Defendants wrongly secured or passively received benefits through the taking of Plaintiffs' assets and business.

MONEY HAD AND RECEIVED – Huntleigh against all Defendants

Defendants hold money that in equity and good conscience belongs to Huntleigh. They should be required to return it.

16

440

## RESPONDEAT SUPERIOR

CMS and Maddali Realty are fully responsible for the actions of its employees, representatives, and agents, including Kalidindi and Maddali.

## DAMAGES

Defendants are general and special damages, including lost profits of Huntleigh and/or reasonable royalties for the unlawful use of its Trade Secrets. Plaintiffs request consequential damages and restitution damages. Defendants are jointly and severally liable. Pursuant to Texas Rule of Civil Procedure 47, Huntleigh and Belle specify that $2 million is the maximum amount of damages claimed by each, and Michael specifies that $200,000 is the maximum amount of damages claimed by him.

## EXEMPLARY DAMAGES

Defendants are jointly and severally liable for exemplary damages under Plaintiffs' claims for or under fraud or tortious interference with contract, or because their conduct was conducted with malice. Defendants are jointly and severally liable for exemplary damages under Plaintiffs' claims for or under:

    a.    tortious interference with contract;

    b.    the Theft Act;

    c.    conspiracy;

    d.    fraud;

    e.    negligent misrepresentation; and

    f.    trade-secret misappropriation.

Any exemplary damages in this case are not subject to the statutory caps. TEX. CIV. PRAC. & REM. CODE § 41.008(c)(10),(11),(12),(13). Defendants misapplied the Trade Secrets

17

441

provided by Plaintiffs in the course of negotiations for the potential purchase of Huntleigh, and these are fiduciary property. Defendants also secured by deception the execution of documents including Michael's employment agreement and the Aug. 23, 2012 letter signed by Michael.

## ATTORNEYS' FEES

Defendants are liable for Plaintiffs' attorneys' fees under Texas Civil Practice & Remedies Code section 38.001. Defendants are liable for Belle's attorneys' fees under the Uniform Fraudulent Transfer Act, section 24.013 of the Texas Business & Commerce Code. Maddali is liable for Plaintiffs' attorneys' fees under promissory estoppel.

## CONDITIONS PRECEDENT

All conditions precedent have been performed, have occurred or are excused.

## PRAYER

Plaintiffs ask the Court to enter a judgment against Defendants, jointly and severally, for:

a.  Actual damages;

b.  Exemplary damages;

c.  Prejudgment and postjudgment interest;

d.  Costs of suit; and

e.  Attorney's fees, both at trial and on appeal.

They also ask for all other relief to which they may be entitled.

442

Dated: March 31st, 2015.

Respectfully submitted,

**DAVIS & SANTOS**
**ATTORNEYS & COUNSELORS, P.C.**

By: _____
Mark Murphy
State Bar No. 24002667
*mmurphy@dslawpc.com*
Guillermo "Jeff" Benavides
State Bar No. 24087160
*jbenavides@dslawpc.com*
112 E. Pecan Street, Suite 900
San Antonio, Texas 78205
Tel: (210) 853-5882
Fax: (210) 200-8395

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document will be sent to the following by:

| | | |
|---|---|---|
| Elliott S. Cappuccio | ____ | Regular Mail |
| Leslie Sara Hyman | ✓ | Certified Mail, RRR |
| PULMAN, CAPPUCCIO, PULLEN, BENSON & | ____ | Hand Delivery |
| JONES, LLP | ____ | Facsimile |
| 2161 N.W. Military Highway, Suite 400 | ✓ | Email |
| San Antonio, Texas 78213 | | |

*Attorneys for Defendants*

on the 31st day of March, 2015.

_____
Mark Murphy

19

443